UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. _____

MR. DOE and MS. ROE, individually and )
on behalf of JOHN DOE, )
)
   Plaintiffs, )
)
  v. )
)
FALMOUTH SCHOOL DEPARTMENT, )
)
   Defendant. )
)

## COMPLAINT

Plaintiffs, Mr. Doe and Ms. Roe, individually and on behalf of their son, John

Doe, complain against the Falmouth School Department as follows:

## **PARTIES AND JURISDICTION**

1. This is an action commenced under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* supplemented by Maine's laws

regarding the education of exceptional students, 20-A M.R.S.A. § 7001, *et seq.*, and

their respective implementing regulations.

2. Plaintiffs Mr. Doe and Ms. Roe, and their son, John Doe, are residents of

Falmouth, Maine.

3. Defendant Falmouth School Department ("Falmouth") is the local

education agency responsible for providing a free appropriate education to students

with disabilities who are residents of Falmouth.

4.   This action seeks judicial review of an administrative decision issued on March 20, 2026, by a Maine Department of Education hearing officer pursuant to the IDEA, 20 U.S.C. § 1415(i)(2).

5.   The hearing officer erroneously ruled that Falmouth met its obligations under the IDEA to offer John an appropriate Individualized Education Program ("IEP") and placement for the 2025-2026 school year.

6.   In seeking to reverse the hearing officer's order under the IDEA, Plaintiffs are parties "aggrieved by the findings and decision" of a due process hearing officer within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

7.   This Court's subject matter jurisdiction is based upon the IDEA, 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A)–(C), and 28 U.S.C. § 1331 (federal question jurisdiction).

8.   The IDEA administrative hearing in this case involved a dispute between the parties concerning Falmouth's failure to provide John Doe with appropriate services and placement under the IDEA. The IDEA requires that each eligible child with a disability receive a free appropriate public education ("FAPE") that "emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

## FACTS COMMON TO ALL COUNTS

9.   John Doe is a student with orthographic dyslexia from Falmouth.

2

10. Falmouth has identified John as eligible for special education and related services since kindergarten, first as a student with an Other Health Impairment and later as a student with a Specific Learning Disability.

11. During kindergarten, Falmouth's school psychologist conducted a psychological evaluation of John, determining that his pattern of strengths and weaknesses were "consistent with a specific learning disability."

12. Falmouth provided John with "tier-three" Response-To-Intervention services in reading and mathematics during kindergarten.

13. Falmouth assessed John again during third grade using the Wechsler Individual Achievement Test, fourth edition ("WIAT-4"), and reported that his scores were in the "extremely low" range (1st percentile) in word reading and oral reading fluency, and in the "very low" range for his reading index and written expression index (both 3rd percentile).

14. The evaluator wrote: "Overall, [John] will find grade level reading material to be challenging to read."

15. During third grade, Falmouth also assessed John using the Test of Orthographic Competence, which revealed that his disability includes a significant deficit in orthographic processing. John performed "within the very poor range overall, demonstrating skills with the first percentile when compared to same-age peers."

3

16. Falmouth offered John IEP services that targeted his literacy skills but not his specific weakness in orthographic processing. It utilized an Orton-Gillingham-based program called SPIRE, which focuses on phonological processing.

17. With SPIRE, John's reading did not improve, and he remained at a first-grade literacy level.

18. During fourth-grade year, John's parents arranged for his test results to be reviewed by John Alexander, the director of the Aucocisco School. Aucocisco specializes in educating students with dyslexia and other learning differences.

19. After reviewing those scores, Mr. Alexander alerted John's parents that he was dyslexic.

20. They enrolled him in one-on-one tutoring at Aucocisco for the summer after fourth grade with Mr. Alexander and another experienced tutor. The tutorials utilized the Lindamood Bell's Seeing Stars program, which targets orthographic processing deficits by focusing on symbol imagery and the reading and spelling of words in isolation.

21. These summer tutoring sessions at Aucocisco made a world of difference for John's reading abilities.

22. Mr. Alexander recommended that John continue with "intensive, systematic reading and spelling instruction" and described the Seeing Stars program as "an orthographic approach to reading remediation."

23. John's parents shared Mr. Alexander's report with Falmouth and asked Falmouth to adjust John's programming based on its recommendations.

24. Falmouth, however, did not adjust John's programming. Instead, it returned to the same Orton-Gillingham instruction that had failed to address his orthographic processing issues.

25. During fifth grade, Barbara Melnick, former director of Aucocisco, assessed John.

26. Ms. Melnick assessed John's orthographic processing skills using the Feifer Assessment of Reading. She found that his fluency index score was at only the 0.3 percentile, and that his scores were at the second percentile or below in phonemic awareness, nonsense word decoding, isolated word reading fluency, and oral reading fluency.

27. These scores meant that his orthographic dyslexia was significant, and his slow processing of language was as if he were in a foreign country each day and trying to translate and process each foreign word in real time.

28. Having lost patience with Falmouth, John's parents decided to place him unilaterally at Aucocisco so he could receive instruction with the Seeing Stars program to address his orthographic processing deficits.

29. John began attending Aucocisco in mid-November 2023, and he made slow but consistent progress, moving from reading at a second-grade level to reading early fourth-grade level texts.

30. In 2024, John's parents filed a due process complaint against Falmouth, seeking reimbursement and placement at Aucocisco.

31. In July 2024, Falmouth agreed to place John at Aucocisco with public funding for sixth grade.

32. John did well at Aucocisco during sixth grade, and both he and his parents were pleased.

33. He and his parents wanted him to stay there for seventh grade, but Falmouth presented a draft IEP in June 2025 that called for him to attend Falmouth Middle School.

34. At the June 2025 IEP Team meeting, Aucocisco's educational director, Kathryn Adams, told the Team that John was reading sixth-grade level passages and should continue at Aucocisco.

35. Falmouth indicated to John's parents that it proposed providing John's specialized reading instruction using an Orton-Gillingham teacher, unlike at Aucocisco.

36. Falmouth also indicated that it would not ensure that John continued receiving 1:1 reading instruction, as at Aucocisco, and instead would receive reading instruction in a small group resource room setting.

37. Although Falmouth had taken no steps to reassess John during sixth grade or the summer after sixth grade, its incoming special education director explained that Falmouth wanted John to return to the public middle school, receive his specialized instruction in a resource room setting, and be reevaluated.

38. Falmouth's proposed seventh grade IEP did not provide for John to continue receiving 1:1 tutorial services for literacy, as he had during the two prior

6

years at Aucocisco, nor did it contain any indication of the reading program Falmouth would use to instruct John. These omissions were important to John's parents because he had had no success with Orton-Gillingham-based instruction when he had been educated in resource room settings in the Falmouth public schools before moving to Aucocisco.

39.  Falmouth refused to provide the information sought by John's parents, stating "We do not name programs" and "We do not name service providers." Similarly, Falmouth declined to indicate how many other students would be in John's literacy class:  "[Mr. Doe and Ms. Roe], I really wish we could answer that question. I know it's really important . . . but we can't give you that answer right now, and I'm sorry."

40.  John's Aucocisco teachers and administrators described his growing confidence, in both reading and social situations at the school. They expressed concerns that he might become uncomfortable, lose that confidence, and retreat into himself if placed in the larger setting of Falmouth Middle School.

41.  Aucocisco's educational director told the IEP Team that John is "comfortable" at Aucocisco, but "when he's in a bigger class, when he's in a group, he will kind of retreat into himself." She also stated: "I do worry for that with him with any academic, you know, language-based instruction in a bigger group."

42.  John's speech-language therapist at Aucocisco explained that John's "comprehension of narrative in particular is strong, but his expressive language is

so discrepant that he has a hard time explaining what he does know." She stated that he had "gained a lot of confidence in the small environment" at Aucocisco.

43. She also said that she had "seen [a] significant increase in his ability to self-advocate. That being said, he's in a tiny classroom, and I think as the expressive language is coming along, he's getting more specific."

44. One of John's teachers at Aucocisco echoed this appraisal, telling the IEP Team that John's "advocacy [is] becoming more specific and frequent. . . . He knows the grown-ups [at Aucocisco] are going to support him in the best way that they can." Another of John's teachers told the IEP Team that John's "confidence has grown so much . . . since he's been here . . . he's just more confident. But he's comfortable around his classmates and he's comfortable around his teachers."

45. This teacher expressed concern about negative outcomes for John if Falmouth were to change his placement, telling the IEP Team: "So if he were to go back to Falmouth, I think that would change drastically. I think he would kind of shrink into a bubble, and he would need a goal for that, because he would be starting at the bottom again. . . . [A] small group is best where he feels confident."

46. Ignoring this evidence presented to the IEP Team, Falmouth offered John only a Falmouth Middle School placement for seventh grade, with no transition period. In that setting, he would be educated in mainstream settings—normally 15-20 students—for nearly half of every school day.

8

47. John's parents rejected this proposal for seventh grade. They elaborated that John wanted to remain placed at Aucocisco, where his confidence had increased and he had been making good academic progress.

48. John's parents and advocate pointed out that Falmouth's proposed IEP was nearly identical to the inappropriate IEP that Falmouth had used to educate him before he left the district for Aucocisco in fifth grade.

49. John's test scores on the Feifer Assessment of Reading from June 2025 indicated progress in the areas important for development of his literacy skills. As Aucocisco's director explained: "He is better able to recognize irregular words in and out of context, apply decoding and encoding skills to unfamiliar and nonsense words, hear and decipher sounds in words, and pull adequate meaning from what he's read. [John] has made measurable academic gains given intensive literacy intervention over the past year and a half, and he should be very proud of his accomplishments."

50. Having rejected Falmouth's proposed IEP for seventh grade, John's parents initiated a new due process proceeding, seeking a continuation of John's program and placement at Aucocisco.

### Due Process Hearing

51. A hearing officer appointed by the Maine Department of Education held a hearing on the Does' due process complaint on December 8, 11, 15, 2025, and January 8, 2026.

52. At the hearing, not one witness who works regularly with John at Aucocisco or has assessed his educational skills indicated that he was ready to transition to a half-day mainstream placement, especially one that lacked 1:1 Lindamood Bell literacy tutorials.

53. Ms. Melnick, who had assessed John prior to his arrival at Aucocisco, and observed him there recently, explained that trying to learn in a mainstream instructional setting would be very discouraging for John, because it would present language and processing demands that would overwhelm him. She likened John's experience to being like a traveler to a foreign country unfamiliar with the native language. She explained that for John, because of his disability, nothing at school is automatic; he requires multiple prompts, lots of visuals, different ways of explaining things, and ample time to process language and work through it on his own.

54. Aucocisco's director echoed Ms. Melnick's prediction, testifying that if John "is feeling overwhelmed, which he definitely will in a [middle school] classroom that's that big, with that much language flying by him, he is at risk for shutting down . . . ."

55. John's parents argued that Falmouth's proposed IEP did not address John's individualized needs, because he requires specialized reading instruction in a 1:1 setting using Lindamood-Bell programming, as he has been receiving at Aucocisco. Citing First Circuit authority that families may not enforce promises of services unless they are formally documented in the student's IEP, they argued that

10

the proposed IEP neglected to specify the programming that John requires to continue making progress in his development of literacy skills.

56. John's parents also took issue with the inappropriateness of placing him in mainstream middle school classes for nearly half of each school day, given his current skill levels, the fragility of his gains, and his overall vulnerability.

57. The hearing officer disagreed and determined that Falmouth's proposed IEP calling for unspecified resource room services for literacy development and its proposed middle school placement, with nearly half of the school day spent in large mainstream settings, were appropriate for John.

58. The hearing officer's rulings were erroneous and did not take into account John's individualized educational needs, while improperly assuming that Falmouth would provide services for John that were not specified in the proposed IEP.

<u>**COUNT I**</u>
**(Review of Due Process Determination:**
**IDEA and 20-A M.R.S.A. § 7207-B)**

59. Plaintiffs repeat the allegations contained in paragraphs 1-58.

60. Federal and state special education laws authorize the Court to conduct judicial review of IDEA administrative decisions and "to grant such relief as the court determines is appropriate." This authority includes the power to reverse or vacate erroneous portion of a hearing officer's order.

61. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against John and his parents by determining that Falmouth's

11

IEP and placement offer for the 2025-2026 school year would provide him with a free appropriate public education.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor against Falmouth School Department, and specifically to provide them with the following relief:

a) to reverse and/or vacate the hearing officer's order, finding that Falmouth violated John's right to a FAPE under the IDEA during 2025-2026 and that his programming and placement should continue at the Aucocisco School;

b) to award Plaintiffs reimbursement of their costs, including their reasonable attorney's fees and litigation expenses, and such further relief as the Court may deem just and proper.

Dated:  April 10, 2026                                    Respectfully submitted,

                                                          */s/ Richard L. O'Meara*
                                                          Richard L. O'Meara
                                                          *E-mail:* *romeara@mpmlaw.com*

                                                          Counsel for Plaintiffs
                                                          Mr. Doe, Ms. Roe, and John Doe

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651